**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



ESTHER SADOWSKY TESTAMENTARY
TRUST, Derivatively on Behalf of Federal
Home Loan Mortgage Corp.,

        Plaintiff,

        v.

RICHARD F. SYRON, ANTHONY PISZEL,
EUGENE MCQUADE, MARTIN
BAUMANN, BARBARA T. ALEXANDER,
GEOFFREY I. BOISI, MICHELLE ENGLER,
ROBERT R. GLAUBER, RICHARD KARL
GOELTZ, SHAUN F. O'MALLEY, THOMAS
S. JOHNSON, STEPHEN A. ROSS,
WILLIAM M. LEWIS, JR., and NICOLAS P.
RETSINAS,

        Defendants,

        - and -

FEDERAL HOME LOAN MORTGAGE
CORPORATION,

        Nominal Defendant

Case No.

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

JURY TRIAL DEMANDED



Plaintiff Esther Sadowsky Testamentary Trust ("ESTT") by its undersigned attorneys, for its Verified Shareholder Derivative Complaint, based upon, *inter alia*, the investigation made by and through its attorneys, alleges as follows:

## SUMMARY OF THE ACTION

1    This is a shareholder derivative lawsuit brought on behalf of Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company") against certain Freddie Mac officers and directors who caused the Company to suffer massive, debilitating financial losses by, among other things, violating the Company's Charter by engaging in unsafe, unsound and improper speculation in high risk mortgages to boost near term profits, report growth in the Company's retained portfolio and guarantee business and take market share away from its primary competitor, Fannie Mae, the other federal housing Government Sponsored Enterprise ("GSE"). The defendants, in effect, bet Freddie Mac's financial future on the prospect that the U S housing market bubble would continue indefinitely The defendants' speculative practices were particularly egregious since they were commenced at the same time that Freddie Mac was suffering from internal controls and reporting problems which were so severe that the Company could neither report its own financial results on a timely basis nor submit capital adequacy reports based on actual GAAP figures - as opposed to estimates - to its safety and soundness regulator, the Office of Housing Enterprise Oversight ("OFHEO"). Inevitably, defendants' speculative house of cards collapsed and led Freddie Mac to announce on November 20, 2007 that it will likely report losses of between $12 and $14 billion over the next several quarters related to failed or underperforming mortgages and that the Company needed to raise capital to maintain capital adequacy reserves mandated by Congress and augmented by OFHEO.

2.    Freddie Mac is a public company, chartered by Congress in 1970 as a Government Sponsored Enterprise ("GSE") to provide liquidity, stability and affordability to the U.S. housing market.

3.    Freddie Mac's Congressional charter dictates that the Company be operated in a safe and sound manner and contains specific provisions with an intent to assure safe and sound operation. For instance, to insulate Freddie Mac from loan losses, the Charter prohibits transactions in speculative mortgages, or purchasing or guaranteeing mortgage loans for which the home purchaser has borrowed more than 80% of the property value securing that mortgage unless the principal and interest payments are insured by an independent entity. The 20% of the property value not borrowed by the home purchaser represents the homeowner's equity in the property. Homeowner equity is Freddie Mac's principal safeguard against credit losses and reduces foreclosure risk. Thus, even if U.S. housing prices decline by 15%, a homeowner who borrowed 80% of the value of his home has an interest in avoiding foreclosure because, even after a 15% decline, the value of the property mortgaged exceeds the mortgage loan amount. Safe and sound operation also dictates that Freddie Mac assure that mortgage originators for whom it purchases and/or guarantees mortgages, adhere to prudent underwriting standards to assure that the home purchaser meets criteria to demonstrate the borrower's ability to repay the mortgage as it comes due and that the value of the property mortgaged appropriately secures the mortgage principal amount.

4.    During the period relevant to this Complaint, however, defendants, in violation of their fiduciary duties, caused Freddie Mac to operate in an unsafe and unsound manner by lowering, contrary to the dictates of its Charter, its credit and underwriting standards which

3

knowingly caused Freddie Mac to undertake high risk transactions that exposed the Company to billions of dollars in losses. At least as early as 2005, and on the heels of a costly embarrassing accounting scandal, caused by, among other things, internal control deficiencies, defendants caused Freddie Mac to undertake exceedingly speculative business practices to boost near term profits, report growth in its businesses and purportedly to capture market share from Fannie Mae.

5    The hundreds of billions of dollars of speculative mortgages Freddie Mac guaranteed and/or purchased were not necessary to carry out its mission to provide liquidity, stability or affordability in the U.S. housing market. During periods relevant to this Complaint, mortgage credit in the U.S. was readily available, highly liquid and so affordable, mortgage credit risk was underpriced. Rather than carry out its Chartered purpose, in pursuit of immediate profit, and to capture market share, Freddie Mac speculated in high risk mortgages. Some came with the low initial teaser payment amounts that escalated over time. Some came with little to no homeowner equity and without requisite third-party guarantee of principal and interest. Some required no documentation of a borrower's income or assets or ability to repay the mortgage. In many cases, the mortgages Freddie Mac purchased or guaranteed made it attractive for people to buy homes they could not afford. The subsequent rash of underperforming mortgages and credit tightening that followed was all but inevitable, as was the onslaught of financial losses and diminished capital position. Freddie Mac's pumping hundreds of billions of dollars into high risk mortgage markets, if anything, fueled speculation that artificially inflated U.S housing prices and destabilized credit markets.

6.    On November 20, 2007, Freddie Mac announced the Company had lost $2 billion in its third quarter ended September 30, 2007, and that the Company would likely report losses in

4

the range of $10 to $12 billion over several quarters due to losses on underperforming mortgages and mortgage related securities. The losses were so severe that Freddie Mac was forced to seek a cash infusion to shore up its balance sheet and to maintain its minimum regulatory capital level. Freddie Mac's diminished capital position prohibited the Company from taking advantage of sound and profitable business opportunities. Further, forced to take drastic action to conserve capital, Freddie Mac revealed that it would likely slash its common stock dividend and restrict growth of its retained portfolio. Freddie Mac's strained capital position also restricted the Company's capacity to carry out its mission during the mortgage credit crunch that commenced during early 2007.

7    Defendants' acts were in violation of their fiduciary duties. Those violations have cause severe damage to Freddie Mac's business, financial condition and reputation, as well as subjecting the Company to heightened regulatory scrutiny going forward. Plaintiff demanded that the Freddie Mac Board take appropriate action against its members and current and former members of Freddie Mac senior management to recoup that damage, but to date they have done nothing. Absent this lawsuit, Freddie Mac's losses will go uncompensated.

## PARTIES

8    Plaintiff ESTT owns and has owned securities of Freddie Mac at all times relevant hereto. Plaintiff brings this action derivatively on behalf of nominal defendant Freddie Mac. This action was not brought collusively to confer jurisdiction upon the Court which it would not ordinarily have.

9    Nominal defendant Freddie Mac is a publicly traded company, created by Congress in 1970 and operating under government charter. Freddie Mac facilitates transactions

between primary lenders that originate residential mortgage loans directly to home purchasers and a secondary mortgage market consisting of investors and dealers who trade and invest in securities that represent claims to principal and interest payments from pools of mortgage loans referred to as mortgage backed securities. Primary lenders sell mortgages to Freddie Mac to replenish their money supplies so they can originate additional mortgages. Freddie Mac bundles mortgages it purchases into mortgage backed securities, guarantees payment of principal and interest on those mortgage backed securities, and then sells those securities to investors in the secondary mortgage markets. Sale of mortgage backed securities replenishes Freddie Mac's capital so Freddie Mac can continue to buy mortgages from primary lenders. Freddie Mac also buys mortgages and mortgage-related securities to hold in its retained portfolio for investment purposes.

10     Defendant Richard F. Syron ("Syron") is the Chairman of the Company's Board of Directors and Chief Executive Officer.

11.     Defendant Anthony (Buddy) Piszel ("Piszel") is the Executive Vice President and Chief Financial Officer of the Company.

12.     Defendant Eugene McQuade ("McQuade") served as Freddie Mac President and Chief Operating Officer from September 1, 2004 until September 1, 2007. McQuade had been expected to be Syron's successor as Freddie Mac's Chief Executive Officer.

13     Defendant Martin Baumann ("Baumann") joined Freddie Mac in March 2004 as Executive Vice President of Finance, became Chief Financial Officer in June 2004 and resigned on March 21, 2006. McQuade assumed Baumann's responsibilities.

6

14.    Defendants Syron, McQuade, Baumann and Piszel are collectively referred to herein as the "Officer Defendants."

15    Defendant Barbara T Alexander ("Alexander") has been a director of the Company since 2004  Alexander is also a director of Centex Corporation, Qualcomm Incorporated, Harrah's Entertainment, Inc , and Habitat for Humanity International. She is also an Executive Fellow at the Joint Center for Housing Studies at Harvard University, where defendant Retsinas (defined below) is the director.

16.    Defendant Geoffrey I. Boisi ("Boisi") has been a director of the Company since 2004. Boisi has been Chairman and Senior Partner of Roundtable Investment Partners LLC, a private investment management firm, since 2005.

17    Defendant Michelle Engler ("Engler") has been a director of the Company since 2001. Engler is a Trustee of the Investor Series Trust, an investment company, and member of the Boards of Managers of JNL Variable Funds, investment companies, since 2000.

18.    Defendant Robert R  Glauber ("Glauber") has been a director of the Company since 2006  He has been a Senior Advisor at Peter J. Solomon Co , an investment bank, since 2006. Previously, Glauber served as Chairman and Chief Executive Officer of the NASD. Glauber currently serves as a director of Moody's Corporation, Quadra Realty Trust and as the lead director of XL Capital Ltd

19.    Defendant Richard Karl Goeltz ("Goeltz") has been a director of the Company since 2003. Previously, Goeltz served as Vice Chairman, Chief Financial Officer and Member of the Office of the Chief Executive of American Express Company  He is currently a director of Delta Air Lines, Inc., Warnaco Group, Inc , New Germany Fund and Aviva plc

7

20.     Defendant Shaun F. O'Malley ("O'Malley") has been a director of the Company since 2001 and its Lead Director since 2003. O'Malley is the retired Chairman of Price Waterhouse LLP. He also serves on the board of directors of Horace Mann Educators Corporation, the Philadelphia Consolidated Holding Corp., and PolyMedix, Inc.

21.     Defendant Thomas S. Johnson ("Johnson") has been a director of the Company since 2004. Johnson has been Chairman and Chief Executive Officer of GreenPoint Financial Corporation. He is also a director of Alleghany Corporation, RR Donnelley & Sons, Inc., and the Phoenix Companies.

22.     Defendant Stephen A. Ross ("Ross") has been a director of the Company since 1998. Ross has been Co-Chairman of Roll and Ross Asset Management Corporation, a quantitative financial management firm, since 1986.

23.     Defendant William M. Lewis, Jr. ("Lewis") has been a director of the Company since 2004. Williams is a Managing Director and Co-Chairman of Investment Banking at Lazard Ltd. He is also a director of Darden Restaurants, Inc.

24.     Defendant Nicolas P. Retsinas ("Retsinas") has been a director of the Company since 2007. Retsinas Serves is Chairman of the Board of Directors of Habitat for Humanity International and serves on the Board of Trustees for the National Housing Endowment, Enterprise Community Partners and the National Housing Conference.

25.     Defendants Syron, Alexander, Boisi, Engler, Glauber, Goeltz, O'Malley, Johnson, Ross, Lewis, and Retsinas, are collectively referred to as the "Director Defendants."

8

## JURISDICTION

26.    This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1332 because "all civil actions to which [Freddie Mac] is a party [are] deemed to arise

under the laws of the United States, and the district courts of the United States shall have original

jurisdiction of all such actions, without regard to amount or value." 12 U.S.C. § 1452(f). This

action was not brought collusively to confer jurisdiction on a court of the United States that it

would not otherwise have. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because,

among other things, many of the acts alleged and complained of herein occurred in this District.

## SUBSTANTIVE ALLEGATIONS

**A.    Freddie Mac Lowers its Underwriting and Credit Standards and Becomes
a Major Insurer/Purchaser of Non-Traditional High Risk Mortgages**

27.    During 2005, Freddie Mac began to purchase and/or guarantee hundreds of

billions of dollars of "alternative" high risk mortgages. In fact, in its 2005 Annual Report,

Freddie Mac acknowledged that the Company expected such alternative mortgages to default

more frequently than the types of mortgages Freddie Mac traditionally guaranteed or purchased.

Among the sorts of high risk mortgages Freddie Mac transacted in were piggy back loans that,

contrary to the Freddie Mac Charter, permitted loan-to-value percentages greater than 80% and

lacked appropriate third-party insurance coverage of principal and interest payments.

**B.    Financial Control Weaknesses at Freddie Mac were so Severe the Company
was Unable to Report Its Own Financial Results on a Timely Basis**

28.    Freddie Mac ramped up its transactions in high risk mortgages while defendants

knew the Company continued to suffer from material weaknesses in its financial controls. For

example, Freddie Mac announced its first quarter 2005 financial results five months late. Indeed,

on August 31, 2005, Freddie Mac issued a press release to announce financial results for its first

and second quarters of 2005. The August 31, 2005 press release stated:

> The company reported GAAP net income of $1,644 million for the first six
> months of 2005, down from $4,066 million for the first six months of 2004. Fair
> value of net assets attributable to common stockholders, before capital
> transactions, increased by $1.1 billion for the first six months of 2005, compared
> to growth of $2.5 billion for the first six months of 2004. Freddie Mac's regulatory
> core capital is estimated to have grown to $36.1 billion at June 30, 2005, with a
> regulatory minimum capital surplus estimated at $12.1 billion at June 30, 2005,
> and an estimated $4.8 billion in excess of the 30-percent target surplus set by the
> Office of Federal Housing Enterprise Oversight (OFHEO).

> "We are making excellent progress on improving the business in ways that will
> both advance our housing mission and reward our stockholders," said Richard F.
> Syron, Freddie Mac chairman and chief executive officer. "In the first six months
> of 2005, we launched a number of new initiatives and products and made progress
> towards meeting our affordable housing goals. We increased our market share,
> further strengthened our capital position and our management team and have
> taken actions to keep our administrative expenses relatively flat for 2005. With
> today's release of financials for the first half of 2005, we have taken another big
> step in our push to being fully current in our financial reporting by early 2006."

> *   *   *

> **Financial Reporting Update**
> As we return to regular quarterly financial reporting, our objective is to continue
> to improve the timeliness of our releases and to file a timely minimum capital
> report with OFHEO, that complies with GAAP, at the end of January 2006. We
> also continue to anticipate beginning our registration process with the Securities
> and Exchange Commission, for the purpose of registering our common stock
> under the Securities Exchange Act of 1934, in the second quarter of 2006, and
> becoming a 1934 Act registrant as soon as possible thereafter.

29.    Despite its untimely financial report, Freddie Mac was forced to acknowledge

more than two months later that the Company had materially overstated net income reported for

the first half of 2005 and issued a second press release on November 8, 2005 to announce it the

revision of financial results reported by the Company on August 31, 2005 and lower reported

profits by 13% or $220 million. In its November 8, 2005 press release, Freddie Mac stated:

that it will reduce net income for the first half of 2005 by approximately $220 million, resulting in reported net income for the first half of 2005 of $1.4 billion, compared with $1.6 billion previously reported in the company's August 31, 2005 press release.

The revision reflects the correction of interest accruals recorded for certain mortgage-related securities stemming from miscalculations since 2001 in a legacy computer system. Management found and corrected the miscalculations in the course of its ongoing internal control enhancements. The correction represents less than one percent of the company's $36.1 billion of reported regulatory core capital as of June 30, 2005.

"We've made enormous strides in fixing our financial infrastructure but, as we have previously disclosed, the effort is not yet complete," said Martin F. Baumann, Freddie Mac's chief financial officer. "When we found this error, we corrected it immediately. We are continuing to move forward to complete the job of producing timely, accurate financial reports early in 2006. We've also made great progress this year in our business — increasing our market share, building on our already strong capital position and maintaining excellence in risk management."

Management has devoted substantial financial and personnel resources to improving Freddie Mac's internal controls and continues to remediate material weaknesses in controls over financial reporting. To provide greater assurance over the reliability of the company's financial reports, management has decided to accelerate a number of previously planned control initiatives into the fourth quarter of 2005.

Freddie Mac expects that its timetable for beginning the registration process with the Securities and Exchange Commission (SEC) will not be significantly changed. The company also expects to release fourth quarter and full-year 2005 results and to begin filing timely, GAAP-compliant monthly capital reports with its regulator, the Office of Federal Housing Enterprise Oversight, no later than the end of March 2006. The company also expects to hold an investor conference call to discuss third quarter performance within the next 30 days. The company expects to release full third quarter financial results upon completing further control work.

**Detail of Accrual Revision**

The miscalculation of interest income stemmed from an error in a legacy computer system used to compute interest on certain mortgage-related securities (primarily non-agency securities) that accrue interest on other than a calendar-month basis. The system over-accrued interest income beginning in the month of

11

purchase, with over-accruals generally decreasing as the security paid down, and reversing in the month the security was sold or matured.

Freddie Mac expects to reduce previously reported net income for the first quarter of 2005 by $136 million to reflect the cumulative overstatement occurring in prior years and by a further $33 million to reflect the overstatement occurring in the first quarter of 2005. Freddie Mac also expects to reduce previously reported net income for the second quarter of 2005 by $51 million to reflect the overstatement occurring in that period.

30.     Similarly, on May 30, 2006, Freddie Mac reported 2005 year end results months late when it issued a press release to report GAAP net income of $2.1 billion for the year ended December 31, 2005. The May 30, 2006 press release stated:

> The decline in net income from $2.9 billion for 2004 was due primarily to approximately $600 million of costs associated with the recent agreement to settle the securities class action and shareholder derivative litigation, charges related to Hurricane Katrina and the net impact of certain accounting changes. Freddie Mac's regulatory core capital is estimated to have grown to $36.0 billion at December 31, 2005, with an estimated $3.5 billion in excess of the 30-percent target surplus. . .
>
> *     *     *
>
> In 2005, Freddie Mac financed homes for more than four million families. In addition, while the final determination will be made by the Secretary of HUD, we reported that we met all of our regulatory affordable housing goals for 2005. We estimate our share of government-sponsored enterprise mortgage securitizations was 45 percent in 2005, compared to 41 percent in 2004, as we improved service quality and products and forged new and stronger relationships with mortgage lenders and other key business partners.
>
> *     *     *
>
> ***Portfolio Growth***
> We continue to deliver on our charter responsibility to be a provider of secondary mortgage market liquidity through both investment and securitization activities. The unpaid principal balance (UPB) of our retained portfolio grew 8.7 percent in 2005, to $710 billion, and grew to $724 billion as of April 30, 2006, an annualized growth rate of approximately 5.8 percent. The UPB of our portfolio of PCs and structured mortgage securities issued grew 10.5 percent in 2005, to

12

approximately $1,336 billion, and grew to $1,390 billion as of April 30, 2006, an annualized growth rate of approximately 12.1 percent. The growth in 2005 was due in part to the company's successful efforts to increase market share. We estimate our share of government-sponsored enterprise mortgage securitizations was 45 percent in 2005, compared to 41 percent in 2004 and 46 percent year-to-date through March. As a result of these activities, during 2005 and continuing through the first quarter of 2006, we believe that we have increased our penetration of the total conventional conforming mortgage market. This increase was largely a result of our improvement in GSE market share and retained portfolio purchases of non-agency mortgage-related securities.

* * *

### *Financial Reporting Update*

During 2006, the company will provide quarterly market updates that will include estimates of net income derived from capital reports submitted to OFHEO, information and analysis on key drivers of current financial and business performance, and updates to the market on our business outlook and progress on financial infrastructure and control remediation initiatives. Our objective is to return to quarterly reporting, and file timely, GAAP-compliant capital reports with OFHEO, with our release of full-year 2006 results. After we resume regular quarterly reporting, we will begin the process of registering the company's common stock with the Securities and Exchange Commission.

31.    By letter dated July 31, 2006, Freddie Mac voluntarily agreed to limit Retained Portfolio growth to 2% per year due to OFHEO concerns of operational risk.

32.    Freddie Mac was unable to report quarterly financial results during 2006. On March 23, 2007, however, Freddie Mac issued a press release to announce financial results for the fourth quarter and year ended December 31, 2006. According to the March 23, 2007 press release:

Freddie Mac (NYSE:FRE) today reported net income of $2.2 billion for 2006, up 4 percent compared to $2.1 billion in 2005. The company also reported an increase in the fair value of net assets attributable to common stockholders, before capital transactions, of approximately $2.5 billion for 2006, compared to an increase of $1.0 billion in 2005. Freddie Mac's regulatory core capital is estimated at $36.2 billion at December 31, 2006, with an estimated $2.6 billion in excess of

13

the 30-percent mandatory target capital surplus set by the Office of Federal Housing Enterprise Oversight (OFHEO)

\* \* \*

"Our plan to repurchase an additional $1 billion in common stock and our significant return of capital to common stockholders in 2006 demonstrate Freddie Mac's progress in improving our capital structure," said Buddy Piszel, chief financial officer. "We've also made progress in our remediation efforts, as demonstrated by today's release of our 2006 annual report. We continue to make good strides towards returning to quarterly reporting later this year."

Net interest income declined by $1.2 billion. During 2006, the unpaid principal balance (UPB) of the company's retained portfolio declined slightly to approximately $704 billion, as relatively tight mortgage-to-debt option-adjusted spreads (OAS) generally limited attractive investment opportunities and the company began managing the portfolio under a voluntary growth limit announced in August 2006

\* \* \*

Management and guarantee income on PCs held by third parties increased to $1.7 billion in 2006 from $1.5 billion in 2005, as the contractual guarantee fee rate in basis points declined modestly and the average balance of outstanding PCs held by third parties increased by roughly 15 percent to $1,045 billion from $909 billion

During 2006, the company's total credit guarantee portfolio increased by 10.6 percent to approximately $1.5 trillion. The company estimates that its share of government-sponsored enterprise (GSE) mortgage securitizations for 2006 was approximately 43 percent, compared to about 45 percent in 2005 and about 41 percent in 2004.

\* \* \*

In 2006, Freddie Mac experienced a slight credit deterioration in its portfolio of loans not impacted by the hurricane as more loans transitioned through delinquency to foreclosure and the expected severity of losses on a per-property basis increased. As a result, the company recorded in 2006 a $297 million provision for credit losses as well as real estate owned expense of $60 million

Estimated regulatory core capital was $36.2 billion at December 31, 2006, with an estimated regulatory minimum capital surplus of $10.3 billion, and an estimated

14

$2.6 billion in excess of the 30-percent mandatory target capital surplus set by OFHEO. During 2006, the company completed the repurchase of approximately $2.0 billion of outstanding shares of common stock (approximately 32.7 million shares) at an average price of $61.06 per share and issued non-cumulative, perpetual preferred stock in the amount of $1.5 billion.

\* \* \*

During 2006, the company recognized a more significant mark-to-market decline in its existing book of business due to the effect of a deteriorating market view of credit and increased market risk premiums related to the company's guarantee obligation. In addition, the company estimates that the fair value of new business booked in 2006 was lower than the fair value of new business booked in 2005.

### Fourth Quarter 2006 Results

As a result of the interest-rate movements in the last quarter, Freddie Mac reported a net loss of $480 million in the fourth quarter of 2006, as realized losses and mark-to-market impacts on the company's credit guarantee portfolio, derivatives and administrative expenses more than offset net interest income and management and guarantee income.

Freddie Mac also reported a decrease in the fair value of net assets attributable to common stockholders, before capital transactions, in the fourth quarter of 2006 of approximately $0.2 billion as the impact of OAS widening, the effect of credit deterioration on the guarantee obligation and administrative expenses more than offset the positive contributions from the company's investment and guarantee activities.

### Credit Risk Management

The company's mortgage credit risk, as measured by the current loan-to-value ratio (LTV) of its credit guarantee portfolio and other credit characteristics, remained low. The company estimates that the credit guarantee portfolio had a LTV of 57 percent as of December 31, 2006, compared with 56 percent for 2005, and the portfolio remains geographically well diversified. Long-term, fixed-rate mortgages constituted 82 percent of the credit guarantee portfolio, despite an increase in the purchase of variable-rate products, including non-traditional mortgage products, during 2006.

\* \* \*

15

### Internal Controls

The company is continuing to make progress on the series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls. These activities are part of Freddie Mac's comprehensive plan for returning to quarterly financial reporting. The comprehensive plan includes mitigation and remediation of identified material weaknesses and significant deficiencies; strengthening of the financial close process; implementing critical systems initiatives; and completion of a review of the company's system of internal controls related to the processing and recording of the company's financial transactions.

**C.    The 2007 OFHEO Report Flags Operational and Financial Control Risks at Freddie Mac**

33.    On April 10, 2007, OFHEO publicly released its Report to Congress regarding Freddie Mac and Fannie Mae (the "2007 OFHEO Report"). In a letter conveying the report to the Banking, Housing and Urban Affairs Committee by OFHEO Director James B. Lockhart III, OFHEO stated that both companies remain "a significant supervisory concern." While OFHEO believed that both companies "made progress in correcting their problems, especially in systems, controls and financial reporting..., it has taken much more time and money to correct them than either the Enterprises or OFHEO expected." OFHEO noted that the Enterprises' "operational risk problems" required a specific limit on the growth of their portfolios.

34.    The 2007 OFHEO Report itself went into great detail on the myriad operational and credit risks plaguing Freddie Mac. Indeed, because of the "continued high state of operational risk, OFHEO continued to require both Enterprises to maintain core capital 30 percent higher than their regulatory minimum capital levels in 2006. At year-end, Freddie Mac's capital of $36.2 billion exceeded its requirement by $2.6 billion and amounted to 4.5 percent of its assets."

16

35.   The 2007 OFHEO Report highlighted the fact that despite Freddie Mac's commitment to separate its CEO and Chairman positions in December 2003, it still had not done so.

36.   The 2007 OFHEO Report's examination conclusions with regard to Freddie Mac, state, in part:

> The Enterprise remains a significant supervisory concern. While efforts toward improvement are underway, senior management continues to revise plans and re-engineer processes to strengthen internal controls and remediate six material weaknesses and a number of significant deficiencies. Leadership from the Board and senior management is challenged as they strive to reshape the corporate culture, publish accurate and timely financial statements, implement long-term sustainable processes, improve overall governance and risk management capabilities, enhance information technology controls and stabilize the organizational structure.
>
> Intensive efforts by the Board and management have been made to address internal control weaknesses; however, several key initiatives to remediate the control environment have not progressed as planned. Progress throughout 2006 was adversely impacted by the volume and complexity of issues, less than effective project management capabilities and inconsistent execution in key segments of the comprehensive plan. Long-term resolution of identified issues will continue to require substantial efforts on the part of Enterprise personnel. The Board and management must continue to focus on needed cultural and organizational improvements identified in the internally-prepared, root-cause analysis to ensure historically weak operating practices are strengthened. Improvements to systems capabilities, information processing controls and the successful implementation of re-engineered business processes will be necessary to restore the overall control environment to a satisfactory condition.

37.   The 2007 OFHEO Report lays out five matters "requiring strong Board oversight":

   *   Internal Controls. "The Board should continue to oversee management's progress toward remediating widespread internal control weaknesses to enable the release of accurate and timely financial statements, permit a return to controls-based auditing and build sustainable internal control governance processes." Indeed,

OFHEO highlighted in the 2007 OFHEO Report that it would not rely on Freddie Mac's internal audit function.

* Information Technology. "The Board should ensure that technology-related issues identified in this report are addressed. Key challenges include gaining a deeper understanding of the key application controls, improving general controls, implementing a systems development process, improving contingency planning and developing a sustainable data and architecture strategy."

* Credit Risk Management. "Continued close monitoring of credit portfolio trends is necessary as higher volumes of non-traditional credit products were purchased during 2006. Although these credit products are within current limits, these products exhibit higher than historical credit risk."

* Corporate-wide Change Management. "The Board should continue to monitor management's efforts to: improve capabilities to effectively manage enterprise-wide change programs, gain a more in-depth understanding of the complexity of and resolution strategies for control weaknesses and support an environment that values strong internal controls and risk management functions."

* Risk Oversight Functions. "The Enterprise Risk Management functions and the Internal Audit department made significant strides to strengthen their respective units and define appropriate governance structures. Continued Board support during the ongoing evolution of these functions and implementation of the risk control self-assessment process will be necessary."

38. OFHEO found that "operational risk is high and continues to be a primary supervisory concern." In fact, OFHEO found that "all internal control-related material weaknesses and significant deficiencies identified during 2005 or prior years' annual audits remain outstanding. The internal control structure remains fragmented, incomplete, and in some cases, undocumented. In addition, current systems limitations did not permit an effective and reliable quarterly close process. Remediation of control weaknesses including independent testing is required (controls must be complete and documented) before management and OFHEO can opine on the effectiveness of the control structure."

39    The 2007 OFHEO Report updated Congress on Freddie Mac's progress with regard to the "Comprehensive Plan" – the primary project to return Freddie Mac to timely financial reporting, improve the control environment and permit reliance on internal controls over financial reporting by the external auditor, which includes: remediating known control weaknesses, the end-to-end business process review, close process improvements and information technology control remediation  During 2006, OFHEO reported that the Comprehensive Plan suffered from ineffective planning and inconsistent execution  "The original plan was submitted in April 2006 and continues to be revised  Aggressive time schedules, lack of independent quality assurance, inadequate management reporting, cultural issues of responsibility and accountability and project management deficiencies contributed to insufficient progress toward achieving the Plan's overall objectives    as of December 31, 2006, no remediation activity has been tested and verified to be effective."

40    With regard to information technology, OFHEO stated that, while successful resolution of a number of the material weaknesses and significant deficiencies at Freddie Mac depend on information technology remediation efforts, "weaknesses continue in information technology systems development and delivery, information security, end-user computing systems, data quality, and change management."

41    The 2007 OFHEO Report noted that Freddie Mac had not completed its effort to codify and update its significant accounting policies and that "significant work remains to develop complete accounting policies and procedures"  Indeed, OFHEO stated that "based on

19

the continued existence of material weaknesses on December 31, 2005," Freddie Mac

"concluded that its internal controls over financial reporting were not effective on December 31,

2005."

42.    The 2007 OFHEO Report delved into Freddie Mac's asset quality and credit risk

management, where "opportunities for improvement were identified." In the Company's Single-

Family Business, the risky strategy employed by Freddie Mac was exposed:

> Management has expanded the Enterprise's purchase and guarantee of higher-risk
> mortgages. In order to increase market share, meet mission goals, stay
> competitive and be responsive to sellers' needs, the Enterprise has increased the
> use of credit policy waivers and exceptions. Untested and alternative market
> products accounted for approximately 24 percent of 2006 new purchases and
> currently comprise 11 percent of the total single-family mortgage portfolio.
> Internal measures of credit quality reflect that the quality of incremental new
> purchases declined in 2006 as evidenced by a rise in expected default costs.

43.    The 2007 OFHEO Report disclosed that, in January 2006, OFHEO "issued a letter

requiring a divestiture plan for certain commercial mortgage-backed securities structures that

were not allowed under the Enterprise's charter; management has completed the sale of those

securities. Management also remediated several matters pertaining to investments in non-agency

home equity asset-backed securities floaters." OFHEO noted that Freddie Mac's asset liability

management activities have a "significant and volatile impact" on fair value and warrant

"scrutiny to ensure that they are properly measured, monitored/reported and subject to

appropriate limits."

44.    With regard to accounting, the 2007 OFHEO Report states that Freddie Mac's

"need to focus on internal control and systems problems continues to inhibit the Enterprises'

ability to respond to changes in the market, the economy and accounting standards."

D.    **Freddie Mac's Untimely Financial Report
      Reflects Deterioration of Credit Quality**

45.    On June 14, 2007, months late, Freddie Mac issued a press release to report

financial results for its first quarter 2007. In its June 14, 2007 press release Freddie Mac:

> reported a net loss of $211 million, or $0.46 per diluted common share, in the first
> quarter of 2007, compared to net income of $2.0 billion, or $2.80 per diluted
> common share, for the same period in 2006. The company also reported a decline
> in fair value of net assets attributable to common stockholders, before capital
> transactions, of approximately $300 million in the first quarter of 2007, compared
> to an increase of $1.0 billion for the same period a year ago. The declines in net
> income and fair value results were primarily due to losses on mark-to-market
> items
>
> * * *
>
> "While significant mark-to-market losses on our portfolio of derivatives, which
> are used to hedge our interest-rate risk, and on our credit guarantee activities have
> resulted in a GAAP loss, we remain encouraged with the underlying fundamentals
> of Freddie Mac's business," Piszel continued
>
> Worsening expectations for mortgage credit risk had an adverse impact on the
> company's GAAP and fair value results. The majority of this effect was due to
> mark-to-market losses associated with wider credit spreads on mortgage assets in
> the company's guarantee portfolio. Overall, Freddie Mac's credit guarantee
> portfolio continued to exhibit credit characteristics that were better than historical
> averages as measured by current delinquencies, loan-to-value ratio (LTV), and
> charge-offs.
>
> Freddie Mac's regulatory core capital was estimated at $36.2 billion at March 31,
> 2007, which represented an estimated $2.0 billion in excess of the 30 percent
> mandatory target capital surplus set by the Office of Federal Housing Enterprise
> Oversight (OFHEO)
>
> * * *
>
> During the first quarter of 2007, the unpaid principal balance of the company's
> retained portfolio increased at an annualized rate of 6.0 percent to approximately
> $714 billion, as liquidations slowed and wider net mortgage-to-debt option-
> adjusted spreads (OAS) generally increased investment opportunities. In August
> 2006, the company and OFHEO announced that effective July 1, 2006, the
> company would begin managing the retained portfolio under a voluntary growth

21

limit. The carrying value of the retained portfolio was approximately $9 billion below the voluntary growth limit at March 31, 2007.

* * *

The company's total credit guarantee portfolio increased at an annualized rate of 16.1 percent to approximately $1.5 trillion at March 31, 2007. The company estimates that its share of government sponsored enterprise (GSE) mortgage securitizations for the first quarter of 2007 was approximately 46 percent, compared to approximately 45 percent for the first quarter of 2006.

* * *

Credit-related expenses, consisting of provision (benefit) for credit losses and real estate owned (REO) operations expense, were $193 million in the first quarter of 2007, compared to $60 million (excluding the reversal of Hurricane Katrina reserves of $84 million) in the first quarter of 2006. The year-over-year change primarily resulted from an increase in the company's provision for credit losses. This increase largely reflects deteriorating credit on 2006 mortgage purchases that have exhibited higher transition rates from delinquency to foreclosure and higher loan loss severities associated with slower home price appreciation and higher unpaid principal balances. Over time the company expects future charge-offs to increase from today's very low levels.

Included in other non-interest expense are mark-to-market losses of $314 million compared to losses of $67 million in the first quarter of 2006. These increased losses reflect the impact of lower market prices on non-performing loans purchased out of guaranteed securities, as well as the impact of higher expected credit and other costs reflected in the market-based valuations of the guarantee obligation associated with new single-family mortgage securitizations. A portion of these mark-to-market losses reflects market uncertainty in the pricing of mortgage credit at March 31, 2007, and accordingly implies higher credit losses than the company expects to ultimately incur.

**Capital Management**
Estimated regulatory core capital was $36.2 billion at March 31, 2007, which represented an estimated regulatory minimum capital surplus of $9.9 billion, and an estimated $2.0 billion in excess of the 30 percent mandatory target capital surplus set by OFHEO. During the first quarter of 2007, the company issued $1.1 billion of non-cumulative, perpetual preferred stock and redeemed $0.6 billion of higher-cost non-cumulative, perpetual preferred stock.

* * *

22

Credit guarantee activities decreased fair value by an estimated $1 2 billion during the first quarter of 2007. This estimate includes a reduction in fair value of approximately $2.0 billion primarily attributable to mark-to-market declines in the fair value of the credit guarantee portfolio. A portion of these mark-to-market declines reflects market uncertainty in the pricing of mortgage credit at March 31, 2007, and accordingly implies higher credit losses than the company expects to ultimately incur.

\* \* \*

**Internal Controls**

Remediation of the material weaknesses and significant deficiencies in Freddie Mac's financial reporting process continues to be a top corporate priority in 2007 The company is continuing to make progress on a series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls. These activities are part of Freddie Mac's comprehensive plan for returning to timely quarterly financial reporting. Efforts made to date have resulted in a strengthened control environment.

The company has made significant progress in addressing its internal control issues. For example, it has addressed the material weakness related to the adequacy of its staffing by adequately filling the company's critical vacancies in areas related to controls and financial reporting. Additionally, the company has addressed the significant deficiency related to governance over new products processes by redesigning the process and controls over the implementation of new products

E.    **Freddie Mac Reveals $120 Billion in Holdings of Non-Agency Sub-Prime Mortgage Backed Securities**

46    On July 25, 2007, in an Information Statement Supplement to the Information

Statement dated March 23, 2007, Freddie Mac announced that as of May 31, 2007, the Company

held in its retained portfolio $120 billion in non-agency securities backed by sub-prime

mortgages. The $120 billion dollar figure did not include non-agency securities held by Freddie

Mac backed by "Alternative-A" mortgages originated without the typical documentation, or any

documentation for that matter, to verify the mortgage applicant's income or ability to service the

mortgage as payments become due

47.     On August 30, 2007, more than a month late, Freddie Mac issued a press release

to announce financial results for the Company's second quarter 2007. In its August 30, 2007

press release, Freddie Mac reported:

> second quarter net income of $764 million, or $1.02 per diluted common share,
> compared to net income of $1.4 billion, or $1.93 per diluted common share, for
> the same period in 2006. The company also reported an increase in fair value of
> net assets attributable to common stockholders, before capital transactions, of
> approximately $800 million for the second quarter, compared to an increase of
> $1.4 billion for the same period a year ago. Compared to the first quarter of 2007,
> the company reported increases in both net income and growth in fair value
> primarily due to gains on mark-to-market items.

>                     *   *   *

> "Our business volumes for the quarter were strong, with continued growth in our
> credit guarantee portfolio and improved commitments for our retained portfolio.
> And we are seeing a shift in the market back to more traditional products,
> including larger volumes of fixed-rate mortgages," Syron continued. "On the
> credit front we are seeing weakening, but we are well positioned relative to the
> overall marketplace to weather the ongoing disruptions in the mortgage markets
> and emerge as an even stronger player.

>                     *   *   *

> "In June, when Freddie Mac resumed quarterly financial reporting, we committed
> to continue to reduce the time it takes us to close our books and report our
> financial results," said Buddy Piszel, chief financial officer. "We have accelerated
> our second quarter release by two weeks compared to the first quarter and expect
> to release our third quarter results before Thanksgiving."

> Freddie Mac's regulatory core capital was estimated at $36.3 billion at June 30,
> 2007, which represented an estimated $1.8 billion in excess of the 30 percent
> mandatory target capital surplus set by the Office of Federal Housing Enterprise
> Oversight (OFHEO).

>                     *   *   *

> Lower net income, year-over-year, was primarily due to a higher provision for
> credit losses and mark-to-market losses on credit-related items. Within total
> revenues, net interest income was essentially flat when compared with the first
> quarter of 2007 and management and guarantee income continued to grow from
> prior period levels.

>                     *   *   *

24

During the second quarter of 2007, the unpaid principal balance of the company's retained portfolio decreased at an annualized rate of one percent to approximately $712 billion, as liquidations increased and relatively tight mortgage-to-debt option-adjusted spreads (OAS) early in the quarter limited net growth in settled positions. Late in the second quarter, wider mortgage-to-debt OAS presented more attractive investment opportunities, resulting in an increase in net purchase commitments during the month of June. Freddie Mac continues to manage the retained portfolio within its voluntary temporary growth limit

\* \* \*

The company's total credit guarantee portfolio increased at an annualized rate of 15 percent in the second quarter of 2007 to approximately $1.6 trillion at June 30, 2007. This compares to forecasted annual growth in total U.S. residential mortgage debt outstanding of approximately six percent in 2007

\* \* \*

Credit-related expenses, consisting of provision for credit losses and real estate owned (REO) operations expense, were $336 million for the second quarter of 2007, compared to $63 million for the second quarter of 2006. The year-over-year increase primarily resulted from the recognition of a $320 million provision for credit losses during the second quarter of 2007. This increase largely reflects credit deterioration on 2006 and 2007 loan originations that have exhibited higher transition rates from delinquency to foreclosure and higher loan loss severities resulting from slower home price appreciation and higher unpaid principal balances.

For the second quarter of 2007, other non-interest expense included losses on certain credit guarantees of $187 million, compared to losses of $52 million in the second quarter of 2006, primarily related to higher fair values of credit costs recognized on certain guarantees associated with new business activity. Also included in other non-interest expense were losses on loans purchased of $205 million, compared to losses of $21 million in the second quarter of 2006, largely due to an increase in the volume of non-performing loan purchases and a decline in the fair value prices of non-performing loans purchased out of PC pools during the quarter.

**Capital Management**

Estimated regulatory core capital was $36.3 billion at June 30, 2007, which represented an estimated $9.8 billion in excess of the regulatory minimum capital requirement, and an estimated $1.8 billion in excess of the 30 percent mandatory target capital surplus set by OFHEO

\* \* \*

**Internal Controls**

Remediation of the material weaknesses and significant deficiencies in Freddie
Mac's financial reporting process continues to be a top corporate priority in 2007.
The company is continuing to make significant progress on a series of initiatives
to improve its financial reporting infrastructure and remediate material
weaknesses and other deficiencies in its internal controls. These activities are part
of Freddie Mac's comprehensive plan for returning to timely quarterly financial
reporting. Efforts made to date have resulted in a strengthened control
environment.

F.     **Key Freddie Mac Executives Jump From the Burning Ship**

48.     On September 7, 2007, in an Information Statement Supplement to the

Information Statement dated March 23, 2007, Freddie Mac announced that Eugene McQuade

was deemed to have resigned from the Freddie Mac board of directors, effective as of

September 1, 2007.

49.     On September 19, 2007, in an Information Statement Supplement to the

Information Statement dated March 23, 2007, Freddie Mac announced that Jeffrey M. Peek

resigned from the Freddie Mac board of directors, effective September 17, 2007. At the time,

Freddie Mac had proposed to purchase securities backed by a portfolio of CIT residential

mortgage loans.

G.     **News of Massive Financial Losses at Freddie Mac Leak into the
       Market and Cause Steep Decline in the Value of Freddie Mac Stock**

50.     On November 20, 2007, in advance of Freddie Mac's announcement of financial

results, The Washington Post reported that Freddie Mac shares declined for a fourth consecutive

day to $37.50 per share -- its lowest levels in a decade – on concerns that Freddie Mac's losses

26

from mortgage defaults would grow. According to <u>The Washington Post</u>, a Credit Suisse analyst

warned the Company may be forced to deplete its capital to cover losses and pay a dividend.

**H.    Freddie Mac Begins to Reveal Staggering Losses From
Failed or Underperforming Speculative Mortgages**

      51     On November 20, 2007, Freddie Mac issued a press release to announce financial

results for its third quarter 2007. In its November 20, 2007 press release Freddie Mac reported:

> a net loss of $2.0 billion, or $3.29 per diluted common share, in the third quarter
> of 2007, compared to a net loss of $715 million, or $1.17 per diluted common
> share, for the same period in 2006. The company also reported a decrease in the
> fair value of net assets attributable to common stockholders, before capital
> transactions, of approximately $8.1 billion for the third quarter of 2007, compared
> to an increase of approximately $300 million for the same period in 2006.
> Compared to the second quarter of 2007, the company reported declines in both
> net income and fair value primarily due to increased credit-related expenses and
> losses on mark-to-market items.

> "Freddie Mac is a housing finance company operating in what today is a troubled
> housing and credit market. It will take time for this market to turn around. But as
> it improves, we are optimistic about Freddie Mac's longer-term prospects. The
> market shift towards fixed rate originations and improved pricing and credit
> standards should position us well as the weakness in credit markets begins to
> improve and we are able to leverage our traditional strengths."

> "Weakening house prices and deteriorating credit have hurt Freddie Mac's results,
> as well as those of other participants in the mortgage market," said Buddy Piszel,
> chief financial officer. "You can see the impact of these trends in our credit results
> and throughout our financial statements. Year-to-date, we have recognized $4.6
> billion in net credit-related items on a pre-tax basis.

> "During the past year we have taken important steps to address the impact of the
> declining housing and credit markets to our business," Piszel added. "We have
> begun raising prices, tightened our credit standards and enhanced our risk
> management practices. We also continue to improve our internal controls as we
> move closer to completing our remediation efforts and returning to timely
> financial reporting. These actions position us well to take advantage of
> opportunities when the current market dislocation ends."

Freddie Mac's regulatory core capital was estimated at $34.6 billion at September 30, 2007, which represented an estimated $8.5 billion in excess of the regulatory minimum capital requirement, and an estimated $0.6 billion in excess of the 30 percent mandatory target capital surplus directed by the Office of Federal Housing Enterprise Oversight (OFHEO).

\* \* \*

Credit-related expenses, consisting of provision for credit losses and real estate owned (REO) operations expense, were $1.2 billion for the third quarter of 2007, compared to $112 million for the third quarter of 2006. This increase reflects observed credit deterioration, particularly on 2006 and 2007 mortgage loan originations that have exhibited higher transition rates from delinquency to foreclosure, and higher expected severities of losses on a per-property basis resulting from slower home price appreciation and higher UPBs on those loans generating losses.

Total credit losses, consisting of net charge-offs plus REO operations expense, were $126 million for the third quarter of 2007 and $263 million for the nine months ended September 30, 2007. Realized credit losses were 3.0 basis points of the average total mortgage portfolio for the third quarter of 2007 and 2.2 basis points of the average total mortgage portfolio for the nine months ended September 30, 2007. The company expects credit losses to continue to increase for the remainder of 2007 and in 2008, especially if conditions, such as home prices and the rate of home sales, continue to deteriorate. For the third quarter of 2007, other non-interest expense included losses on certain credit guarantees of $396 million, compared to losses of $103 million in the third quarter of 2006, primarily related to higher market-measured future credit costs on newly-issued PCs. Also included in other non-interest expense were losses of $483 million on loans purchased out of PC pools, compared to losses of $30 million in the third quarter of 2006, largely due to an increase in the volume, and a decline in the estimated fair value, of non-performing loans purchased out of PC pools during the quarter. During the third quarter of 2007, the company recognized $58 million in net interest income on re-performing loans previously purchased and $109 million in other non-interest income associated with the recapture of previously recognized market value losses on purchased loans due to borrower payments or higher realized loan foreclosure values.

Estimated regulatory core capital was $34.6 billion at September 30, 2007, which represented an estimated $8.5 billion in excess of the regulatory minimum capital requirement, and an estimated $0.6 billion in excess of the 30 percent mandatory target capital surplus directed by OFHEO. Retained portfolio sales in September

and October largely reflected activities to manage to the 30 percent mandatory target capital surplus.

As a result of GAAP losses and in order to manage to the 30 percent mandatory target capital surplus and respond to regulatory concerns, as well as to have the flexibility to effectively manage its business, the company is planning on taking several actions. First, the company has engaged Goldman Sachs and Lehman Brothers as financial advisors to help it consider very near term capital raising alternatives. Second, the company is seriously considering reducing its fourth quarter common stock dividend by 50 percent. If these measures are not sufficient to help the company manage to the 30 percent mandatory target capital surplus, then the company may consider additional measures in the future such as limiting growth or reducing the size of our retained portfolio, slowing purchases into our credit guarantee portfolio, issuing additional preferred or convertible preferred stock and issuing common stock. When market conditions improve and Freddie Mac returns to sustainable profitability, the company will consider increasing the common stock dividend and returning capital to its shareholders through, among other things, calling preferred stock.

\*   \*   \*

During the third quarter of 2007, the fair value of net assets attributable to common stockholders, before capital transactions, decreased by approximately $8.1 billion, compared to an increase of approximately $300 million in the third quarter of 2006.

Attribution of changes in fair value relies on models, assumptions, and other measurement techniques that evolve over time. The following attribution is the company's current estimate of the items presented (on a pre-tax basis) and excludes the effect of returns on capital and administrative expenses.

Investment activities in the company's retained portfolio decreased fair value by approximately $5.9 billion during the third quarter of 2007, compared to an increase in fair value of approximately $500 million during the third quarter of 2006. These estimates include a reduction in fair value of approximately $8.0 billion attributable to net mortgage-to-debt OAS widening in the third quarter of 2007. Of this amount, approximately $3.5 billion was related to the impact of the net mortgage-to-debt OAS widening on the company's portfolio of non-agency mortgage-related securities.

\*   \*   \*

29

Credit guarantee activities decreased fair value by an estimated $6.4 billion during the third quarter of 2007, compared to a decrease in fair value of an estimated $400 million during the third quarter of 2006 These results include amounts related to net cash flows received, as well as changes in the fair value of the single-family guarantee asset and obligation

\* \* \*

Remediation of the material weaknesses and significant deficiencies in Freddie Mac's financial reporting process continues to be a top corporate priority in 2007. The company is continuing to make progress on a series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls These activities are part of Freddie Mac's comprehensive plan for returning to timely quarterly financial reporting Efforts made to date have resulted in a strengthened control environment.

52    On November 20, 2007, Freddie Mac held a conference call with analysts to discuss the Company's financial results for its third quarter ended September 30, 2007. During the conference call chief business officer Patti Cook stated that Freddie Mac's 2006 and 2007 book of business:

are expected to realize higher expected default costs than prior books for two reasons. First, the recent weakening . of house prices have increased expected default costs for the 2006 and 2007 books compared to prior years. Second, there was an increase with risk layering mortgages For example, mortgages with FICO scores less than 620 and original LTVs greater than 90, are more concentrated in the 2007 book .

53.    According to Cook, to limit credit exposure, Freddie Mac began restricting credit terms and increasing prices for its bulk channel purchases. While bulk purchases represented only 15% of total purchases, they account for a disproportionate share of Freddie Mac's lower credit quality purchases. In flow purchases, Freddie Mac raised its fees for loans with higher risk characteristics and added fees for loans with LTVs greater than 70% and FICO scores below

680. Freddie Mac was also discontinuing purchase of no income, no asset loans and reinforcing its declining markets requirements.

**I.     Freddie Mac's Estimate of Future Default Costs Tops $16 Billion**

54      Cook further stated that Freddie Mac's guarantee obligation ("GO"), the present value of future default costs on the Company's guarantees, as of September 30, 2007 was $16.8 billion. In its third quarter 2007, Freddie Mac recognized $3.5 billion of the credit costs and $4.9 billion year to date. Only a third of the $16.8 billion GO was recognized on a GAAP basis as of September 30, 2007. Freddie Mac stated that it would recognize the remainder of the $16.8 billion GO on a pay-as-you-go basis.

**J.     Freddie Mac Reveals Bleak Near Term Outlook**

55      Piszel stated that given that the current market conditions continued to work against the Company, Freddie Mac was projecting its fourth quarter performance to be in line with the third quarter 2007.

**K.     Freddie Mac Acknowledges that its Diminished Capital Position Prohibits the Company From Engaging in Profitable Business Opportunities**

56      In response to Bear Stearns analyst David Hochstim commenting that Freddie Mac's erosion of capital prohibited the Company from taking advantage of wider spreads and buying high return assets, i.e., increasing shareholder value, Syron responded:

> Well, David, you have addressed a very key issue, obviously, and the issue you have addressed has underneath it that we have the opportunity now to put profitable business on the books, but we're constrained by capital. And that's a major factor.

L.    **Freddie Mac is Forced to Raise Money to Maintain**
      **Minimum Capital Requirements Set by OFHEO**

57.    Given uncertainty of GAAP results and credit conditions as well as uncertainty on
relief from the 30% capital surplus, Freddie Mac was planning very near term actions to raise its
capital balance. To that end, Freddie Mac engaged Lehman Brothers and Goldman Sachs to help
consider capital raising alternatives. The Company was also seriously considering a 50%
reduction in the common dividend.

58.    During the question and answer portion of the call, Fox Pitt Kelton analyst
Howard Shapiro asked, "[d]id you go to OFHEO and ask for relief on the 30% capital surcharge?
You are proposing to dilute shareholders, so please don't tell us that it's a question you don't
want to answer on a public call." Syron responded:

> Well, we respect and abide by our regulators, which isn't how we deal with these
> things. We have had discussions with them on the 30%. That obviously is a key
> issue and I would expect that we would be having those discussions as time goes
> forward.

> **Howard Shapiro:** Did they say no?

> **Dick Syron:** You can interpret the answer, I think.

> **Howard Shapiro:** So the regulators said no. Okay . . . .

59.    For a sense of the magnitude of Freddie Mac's capital raising plans, UBS analyst
Eric Wasserstrom asked given that the dividend cut is actually in the scheme of things a very
small number, "I'm trying to get a sense of how else you would prioritize the actions and what the
potential magnitude of them could be?" Syron responded:

> . . . I think we have indicated we're talking about doing things in the preferred
> space. Okay? We have not talked this fully through with our Board. We have
> obviously talked to our Board, but we haven't gone through the full governing

process in a formal sense. So in all due respect, I don't want to get too precise about this. Let me put it this way. We are - we're not happy about this. We don't expect you to be happy about this. But we are trying to do this in a way that's either least worst or most friendly to our existing shareholders.

60. On November 21, 2007, The New York Post stated that the panic caused by the massive $2 billion third quarter loss - revealed in just the third quarterly report issued by Freddie Mac in five years - sent the market price of Freddie Mac common stock "hurtling down an astounding 28 percent to $26.74, a drop of $10.76" per share. The New York Post reported that the "once mighty" Freddie Mac was forced to seek a cash infusion to shore up its balance sheet. Lehman Brothers and Goldman Sachs had been hired to raise up to $10 billion in capital in the form of a gigantic convertible preferred stock offering in the near future. According to The New York Post, to maintain its regulatory minimum capital level, Freddie Mac was considering options previously considered "unimaginable" such as slashing its dividend and reducing the size of its mortgage portfolio.

61. On November 21, 2007, Financial Times (London) reported that Freddie's capital constraints raised the prospect that it would be unable to provide additional liquidity to the mortgage market at a time of urgent need. Howard Shapiro, an analyst at Fox Pitt, Kelton, was quoted as stating, "the last provider of liquidity in the mortgage marketplace is now liquidity restrained," and that "This will exacerbate the housing downturn." The Financial Times (London) article further reported that Freddie Mac said it was struggling because regulators wanted it to hold 30 per cent more capital than its mandatory minimum. The measure was imposed by OFHEO after Freddie was found to have made accounting errors up to 2002 that resulted in it overstating earnings by $5 billion dollars. Freddie now has just $600 million dollars

more in capital than is required  OFHEO had turned down a request to reduce or remove the

surplus capital requirement  Syron said the capital requirement was preventing the company from

buying profitable loans

      62     On November 27, 2007, Freddie Mac issued a press release stating that it would

issue $6 billion of non-cumulative perpetual preferred stock. The November 27, 2007 press

release further stated that:

> Last week, Freddie Mac announced that, in order to meet the 30 percent
> mandatory target capital surplus directed by the company's safety and soundness
> regulator, the Office of Federal Housing Enterprise Oversight (OFHEO), as well
> as to have the flexibility to further its franchise value, it planned to take near-term
> capital raising actions. As also announced today, the company has decided to
> reduce its fourth quarter common stock dividend to $0.25 per share
>
> Freddie Mac's estimated regulatory core capital was approximately $34.6 billion
> at September 30, 2007. Freddie Mac's minimum capital requirement at that date
> was $26.2 billion and the 30% mandatory target capital surplus was an additional
> $7.9 billion  Accordingly Freddie Mac's estimated regulatory core capital at
> September 30, 2007 represented an estimated cushion of $8.5 billion in excess of
> the company's regulatory minimum capital requirement and an estimated surplus
> of $0.6 billion in excess of the 30 percent mandatory target capital surplus
> imposed on the company by OFHEO. The capital raised through this offering will
> be used to bolster the company's capital base in light of actual and anticipated
> losses necessitated by GAAP accounting requirements and help Freddie Mac meet
> the 30 percent surplus going forward.
>
> "Freddie Mac is announcing today a proactive capital management plan that will
> help us meet the 30 percent surplus and address regulatory concerns and GAAP
> accounting requirements, provide sufficient capital to continue fulfilling our
> important housing mission through the current market environment, and better
> position us to effectively manage the company going forward," said Freddie Mac
> Chairman and Chief Executive Officer Richard F. Syron.

      63.    On December 7, 2007, The Washington Post published an article detailing

Freddie Mac's purchasing of risky "piggy-back" loans.  A piggy-back loan is a second mortgage

that closes simultaneously with the first.  Often, the first loan is for 80 percent of the value of the

home, and the second is for 10 percent or more of the remaining value of the home. Traditionally, home buyers were required to make down payments on homes with money of their own. The down payment gave the home buyers an equity stake in their property at the time of purchase. Home owner equity reduces foreclosure risk. In its Annual Report for 2003, Freddie Mac stated that apart from mortgage insurance "[o]ur principal safeguard against credit losses for mortgage loans is provided by the borrowers' equity in the underlying properties." In fact, to insulate the Company from credit losses, Freddie Mac's Congressional charter prohibits the Company from purchasing or guaranteeing mortgages that represented more than 80 percent of a home's value, unless the mortgage is independently insured for borrower defaults.

64       Nevertheless, in 2005, Freddie Mac became a major purchaser of mortgages originated by lenders who permitted home buyers to borrow all or part of the remaining 20 percent by using second loans, called "piggy-back" loans, with no insurance against default.

65       The relationship between principal outstanding on the mortgage and the property value, referred to as the loan-to-value, or LTV, ratio, is a key measure of loan quality. Freddie Mac features LTV ratios in its financial reports, and Syron cited it in his letter to shareholders for 2006. The LTV ratios Freddie Mac publicly disseminated failed to reflect the combined total of multiple loans on the same property until November 2007, when the Company revealed that such arrangements could leave borrowers more susceptible to foreclosure.

66       Including second loans, Freddie Mac estimated that about one in seven of the single-family mortgages it held on September 30, 2007 had total loan-to-value ratios of more than 90 percent, compared with one in 20 if it excluded the piggyback loans. According to Freddie Mac spokesperson Michael Cosgrove, Freddie Mac made the recent disclosure about the

35

effect of second loans because the Company has been trying to improve its financial reporting and "felt that it was important information for the market to have "

67.     The Company assured investors several months earlier in its 2006 annual report that mortgage loans with "lower levels of borrower equity" carried insurance or other financial backstops  Freddie Mac executives later revealed that statement was framed in terms of the Company's loan-to-value ratio, which excludes piggybacks, and not total loan-to-value, which includes them.  With regard to the discrepancy, Piszel was quoted as stating "I would chalk that up to less precision in the [2006 Annual Report] disclosure."

68.     Even excluding piggybacks, however, the percentage of loans with high ratios has been creeping up this year   At the end of the third quarter, 17 percent of Freddie Mac 's mortgage investments had ratios of more than 80 percent  Overall, for 1 percent of Freddie Mac 's holdings, the loan-to-value ratio was more than 100 percent, meaning that the real estate serving as collateral for the loans was worth less than the loans.  During 2007, as the market deteriorated, Freddie Mac 's investment in alternative loans grew.  For the first nine months of 2007, nontraditional loans made up about a third of Freddie Mac 's mortgage purchases, up from almost a quarter in the first nine months of 2006.

69     Freddie Mac is predicting it will have to set more money aside to cover losses on mortgages made in 2006 and 2007, partly because they had "lower amounts of third-party insurance coverage and higher loan balances at the time of origination than our historical experience," according to its latest quarterly report.

70.     The purchase of piggyback loans is one of many factors that has left Freddie Mac exposed to potentially larger losses as a nationwide credit bubble deflates. The Company turns

out to have been more vulnerable to a downturn in housing prices than had been portrayed. At a time when some policymakers hoped it would help ease a credit crunch by serving as a loan buyer of last resort, Freddie Mac was selling mortgages to shore up its own financial condition. Its speculative, unsafe, unsound activities diminished its ability to perform the role for which it was Chartered by Congress

**M.    To Preserve Diminished Capital Freddie Mac Announces Operational Change in Purchase of 120 Day Delinquent Mortgages**

71.    On December 10, 2007, in an Information Statement Supplement to the Information Statement dated March 23, 2007, Freddie Mac announced operational changes for purchases of delinquent loans from mortgage PCs. Freddie Mac announced that it would no longer purchase mortgages from PC pools shortly after they reached 120 days delinquent. Under the new policy, Freddie Mac would generally not purchase delinquent mortgages in PCs until the mortgages have been modified, a foreclosure sale occurred, the mortgages are delinquent for more than two years; or the cost of guarantee payments to security holders, including advances of interest at the security coupon rate, exceeds the cost of holding the non-performing loans in its mortgage portfolio

72    According to the December 10, 2007 Information Statement Supplement, the operational change would have the effect of reducing the Company's capital costs and increase expenses associated with delinquent loans.

73    On December 11, 2007, Goldman Sachs held a Financial Services Conference attended by Syron and Piszel At the conference, Syron reiterated that Freddie Mac's fourth quarter 2007 results were not expected to be better than its third quarter 2007 results. During the

conference one analyst asked, "looking back at the Company's actions in '05, '06 and the first half of '07, when it was pretty clear that credit risk was being priced poorly from the standpoint of those who where purchasing it, and your portfolio was growing at mid to high teens' rates. You clearly made a strategic error. Can you talk about looking back on that time and how you might learn to do better in the future?" Syron responded:

> Yes. I think that's a tough question, it's the right question. I think it is the right question. Now, it's a tough time. We didn't do everything perfectly. To some extent, some of this we had control over, and some we didn't have control over. As you know, and I think everybody's got to take a look at this model, the way the industry works - the GSE industry - is that we give people a price sheet - a price grid, if you want - kind of a year in advance. And then we have a [pay or take] or whatever you want to call it. They deliver us the product. We've contracted that we'll already take - that we'll take that. So we can't in our flow business turn the spigot on and off every day and say, Gee - I don't want that product. You could say, even a year before that, when those contracts were being established - Should we have tightened up on some things? I think the answer is yes, to some extent. It's tough, though . . In '03, our market share dropped to 33%. It's pretty tough when the other guy [Fannie Mae] is twice your size. We came back to 43%. We don't have to draw any lines in the sand. We're going to defend the market share at a certain price. But you don't want to drop to 20% or 25% either. And market pricing was crazy for us the whole sector. So some of this stuff, you would have had to turn the spigot a lot a head of time.

> Where this is, I think, even more though, ability for criticism is some of the stuff we took in the bulk business . . . looking back, I wish we'd been more pressing and had tightened up on it, to be honest about it. And I think probably there were, at the margin, some mistakes, and we're committed to not do it again.

74.    An attendee of the conference asked about the GO and that the Company's reported results to date covered just half of that credit loss so if expectations play out, would Freddie Mac erode the $6 billion in capital the Company just raised?

> Piszel: Well, you think about timing in which this is going to emerge. And I said that we're trying to take some actions, because the big way that the credit emerged in the third quarter was on these marks. And some of the marks and some of the accounting we're trying to get out of because we don't think its representative of

where, ultimately, the credit will come from and the way it should be emerging in the numbers. So, you're right. We said that we're expecting defaults in the $10 to $12 billion range overall. We've taken $4.5 billion through the first three quarters. So we're basically halfway there. We're assuming we're going to take the rest over the next couple of years.

N.   **OFHEO Flags Critical Need for Operational Reform and Increased Regulatory Control Over the Operations of Freddie Mac**

75.   On February 7, 2008, the Honorable James B. Lockhart III, OFHEO's Director, issued a statement on "Reforming the Regulation of the Government Sponsored Enterprises" to the Senate Banking, Housing and Urban Affairs Committee (the "OFHEO Director Statement"). The OFHEO Director Statement notes that the GSEs, including Freddie Mac, "expanded rapidly in 2007 with their market share rising to record levels in the fourth quarter of 2007" and that the GSE's "have become the dominant funding mechanism for the entire mortgage system..." The GSE's, however, Director Lockhart stated, have been "concentrating mortgage risks on themselves." These "risks are beginning to take their toll." Indeed, he added that Freddie Mac will report an annual loss for the first time in its history.

76.   Director Lockhart flatly stated that the expansion of the GSEs activities, including those of Freddie Mac, "would be imprudent unless the regulator has significantly more powers and more flexibility to use those powers."

77.   The OFHEO Director further stated that while operational risk and market risk had been key focuses of the Enterprises, there had not been enough attention paid to credit risk. Indeed, Director Lockhart stated "I remember listing credit risk concerns in an early presentation I did to one of their Boards. Some members were mystified that I thought it was an issue given their track record. I am afraid that was a sign of the times."

39

78.     The inattention to credit risk was clearly taking its toll on Freddie Mac. Director Lockhart noted that credit losses for the Enterprises were approaching "double normal levels and climbing. Some of this growth in losses was because they lowered underwriting standards in late 2005, 2006, and the first half of 2007 by buying more non-traditional mortgages to retain market share and compete in the affordable market."

79.     The OFHEO Director Statement went on to detail the "critical need for GSE reform." Director Lockhart posed the "key question," i.e., "whether Fannie Mae and Freddie Mac will be able to continue to support the conforming mortgage market in a safe and sound manner while assuming additional responsibilities in the subprime and jumbo markets." He then answered the question: "My answer as the safety and soundness regulator is yes, but only if Congress passes comprehensive GSE reform."

80.     Director Lockhart noted that "Unlike any other financial regulator, OFHEO is lacking mission and new product authority." One of OFHEO's obstacles to being an effective safety and soundness regulator is that it has a "strange budget mixture where we are funded by Freddie Mac and Fannie Mae, but yet we are appropriated by Congress as if we were funded by taxpayers. In only two of our fifteen years has OFHEO known how much money we had to spend when the year started. Uncertain funding levels and the resulting under-staffing is not the way to run a regulator."

**O.    Freddie Mac Announces 2007 Losses and Weak Prospects for 2008**

81.     On February 28, 2008, Freddie Mac issued a press release to announce results for its fourth quarter and year ended December 31, 2007. According to the February 28, 2008 press release, Freddie Mac reported:

40

a net loss of $3.1 billion, or $5.37 per diluted common share, for the year ended December 31, 2007, compared to net income of $2.3 billion, or $3.00 per diluted common share, for 2006. For the fourth quarter of 2007, the net loss was $2.5 billion, or $3.97 per diluted common share, compared to a net loss of $401 million in the fourth quarter of 2006, or $0.73 per diluted common share.

\* \* \*

Looking ahead to 2008, Syron commented, "We remain extremely cautious as we enter 2008. If the economy weakens substantially from here — a possibility for which we need to be prepared as a company — it will have a further negative effect on homeowners across the country and drive credit costs higher. However, we have taken the steps to add capital, tighten our management of credit risk and institute pricing policies that are more consistent with the risk we bear. These actions should help us build the business for the future."

"With our large capital raise in the fourth quarter, we boosted our surplus relative to OFHEO's 30 percent mandatory target capital surplus," said Buddy Piszel, chief financial officer. "In 2008, we will continue to prudently manage our capital, particularly given the outlook for continued weakening in the housing market."

Net loss was $2.5 billion for the fourth quarter of 2007, compared to a loss of $1.2 billion for the third quarter of 2007. The majority of this increase in loss resulted from significant mark-to-market losses detailed below in the discussions of other non-interest loss and other non-interest expense. Without giving effect to the accounting changes for the company's guarantee obligation discussed above, the fourth quarter 2007 net loss would have been $3.7 billion.

**Credit-related expenses**, consisting of provision for credit losses and real estate owned (REO) operations expense, were $912 million for the fourth quarter, compared to $1.4 billion for the third quarter. The provision for credit losses in the third and fourth quarter included amounts related to increased estimates of incurred losses on mortgage loans associated with higher default rates, an observed increase in delinquency rates and increases in severity of losses on a per-property basis, driven in part by the declines in home sales and home prices. The company expects credit-related expenses to remain high relative to recent periods and to vary from period to period as the U.S. housing market remains under pressure.

Total credit losses, consisting of net charge-offs plus REO operations expense, were $236 million for the fourth quarter, $126 million for the third quarter and $499 million for the full-year 2007. Realized credit losses were an annualized 5.4 basis points, 3.0 basis points and 3.0 basis points of the average total mortgage

41

portfolio for the fourth quarter, the third quarter and full-year 2007, respectively. The company expects total credit losses to increase in 2008. In addition, as a result of the continuing deterioration in the U.S. housing market, the company has revised its estimate of total credit losses for 2008 and 2009 to $2.2 billion and $2.9 billion, respectively. Other non-interest expense for the fourth quarter was $2.1 billion, compared to $1.2 billion for the third quarter. Fourth quarter non-interest expense included losses on certain credit guarantees of $1.3 billion, compared to $392 million for the third quarter, primarily related to higher expected future credit costs reflected in the market-based valuations of the guarantee obligation associated with newly-issued PCs. The company expects that price increases, including the delivery fee increase effective in March 2008, may mitigate a portion of the losses on certain credit guarantees. Also included in other non-interest expense for the fourth quarter were losses of $736 million on loans purchased out of PC pools, compared to losses of $649 million in the third quarter, largely due to a decline in the estimated fair value and an increase in the average unpaid principal balance per loan of non-performing loans purchased out of PC pools. The company announced in December 2007 certain operational changes for purchasing delinquent loans from PC pools. This action is expected to reduce the losses on loans purchased out of PC pools and result in a higher provision for credit losses associated with our PCs and Structured Securities. During the fourth quarter, the company recognized $273 million in other non-interest income associated with the recapture of previously recognized market value losses on purchased loans due to either borrower payoffs or property fair values upon foreclosure that exceeded the carrying basis of the loan.

## Core Capital

Estimated regulatory core capital was $37.9 billion at December 31, 2007, which represented an estimated $11.4 billion in excess of the company's regulatory minimum capital requirement, and an estimated $3.5 billion in excess of the 30

percent mandatory target capital surplus directed by the Office of Federal Housing Enterprise Oversight (OFHEO).

In order to manage to the 30 percent mandatory target capital surplus and improve business flexibility, during the fourth quarter of 2007, the company issued $6.0 billion of non-cumulative, perpetual preferred stock, reduced its common dividend by 50 percent and reduced the size of its cash and investments portfolio.

## Fair Value of Net Assets

The company's attribution of changes in fair value relies on models, assumptions, and other measurement techniques that evolve over time.

At December 31, 2007, the fair value of net assets was $12.6 billion, reflecting a net after-tax reduction of $19.2 billion from the December 31, 2006 level of $31.8 billion. This change in fair value of net assets reflects the impact of net cash flows received from guarantee activities; core spread income received from investment activities; the payment of preferred and common stock dividends; other capital transactions, including the issuance of $6 billion in preferred stock during the fourth quarter of 2007; and changes in fair value of assets and liabilities managed in the company's underlying businesses.

The company estimates that wider net mortgage-to-debt OAS resulted in a pre-tax reduction in fair value of $23.8 billion for the year ended December 31, 2007. In addition, the company estimates that a change in fair value of the net single-family guarantee asset and obligation resulted in a pre-tax reduction of $20.1 billion for the year ended December 31, 2007.

### *Internal Controls*

Remediation of the known material weaknesses and significant deficiencies in Freddie Mac's financial reporting process was a top corporate priority during 2007 and continues into 2008.

82.    On February 28, 2008, Freddie Mac held an earnings conference call with analysts

to discuss the Company's fourth quarter and full year ended December 31, 2007. During the call

Syron stated that the announcement of 2007 financial results was a "momentous time for Freddie

Mac in two dimensions:

> One is good and one is bad. After many years of effort, we're finally delivering timely financial reports . . .
>
> Unfortunately, the financials we're delivering are far from pretty. As we indicated in our call in November, continuing adverse trends in house prices, mortgage credit and fixed income markets contributed to significant losses in the fourth quarter.

*    *    *

> Giving effect to the impact of adopting the fair value option at the beginning of '08, our capital stood at approximately $39 billion, with an estimated surplus of about $4.5 billion over the 30 percent mandatory surplus target. This is about where we expected to be at the point following our preferred deal last year. At the

43

current level and surplus, management believes that we have sufficient capital to provide for modest growth in our business and to weather the downturn in the absence of significant further disruptions. . .

* * *

[W]e have made significant progress towards fixing our internal control matters. To summarize, as of today, we have remediated three of the identified six material weaknesses and we've implemented controls, which we believe will be sufficient to remediate the remaining items in the near future. Along with returning to timely reporting, this step is crucial for the purpose of becoming an SEC registrant - a process we expect to initiate in the first half of this year.

83.     Patti Cook reported on Freddie Mac's business during the analysts call and stated:

There are six themes that I want to highlight . . First, housing prices declined significantly in the fourth quarter at an estimated 4 to 5 percent value-weighted rate on our portfolio across the U.S. as a whole. Second, spreads on mortgage assets widened significantly in the fourth quarter and expectations for future credit losses in our guarantee business increased, producing significant losses. However, the majority of the mark-to-market losses are not expected to be realized. Third, Freddie Mac and GSE share as a whole continued to gain in the single-family and multifamily markets during the fourth quarter. Fourth, Freddie Mac continued to tighten credit, raise fees and widen spreads in our single-family and mutifamily businesses. Fifth, while the 2007 single-family book is clearly worse than the 2006 book, it appears that beginning late in the fourth quarter the underlying credit quality fo new single-family mortgage originations began to improve. Finally, following our preferred issue in December, and the recent announcement by OFHEO that the portfolio cap will no longer be in place as of March 1st, we continue to manage our capital prudently to provide for reasonable growth in our business as well as maintain capital sufficiency through the current credit downturn.

So first, the decline in house prices in the fourth quarter and the impact on credit. The large decline in house prices in the fourth quarter has led us to increase the expected decline in our median house price path to approximately 15 percent peak to trough, causing us to increase our expectations for expected default costs. While the relationship between house prices and defaults is clear, the forecast for expected defaults is not precise. This is particularly true in this environment as the rate of decline nationally is without recent precedent and the lack of correlation between unemployment and declining house prices is also unusual. Recognizing the challenges in forecasting defaults and losses, our best estimate is that the net present value of total expected default costs with range between $10

44

and $15 billion given these assumptions. This compares to our prior guidance of $10 to $12 billion. This estimate of expected default costs is about half of the GO on our fair value balance sheet.

\* \* \*

Next, fair value. Fair value declined significantly during the fourth quarter, about $17 billion after tax, bringing the year-to-date decline to approximately $25 billion after tax. This markdown is split about evenly between the guarantee business and the investment business.

\* \* \*

Let's move on to the decline in fair value of the guarantee business. The g-fee business was affected by declining house prices which resulted in the current loan-to-value ratio of our portfolio increasing as delinquency rates increased and mortgage-related credit spreads widen further. The combination of these factors led to an expectation of higher expected default costs and significantly higher risk premiums.

The result is a decline in the fair value of the g-fee business of about $9 billion for the quarter and $13 billion for the year, after tax. About half of the increase is a function of higher expected default costs.

\* \* \*

We've made four changes to our prices in credit guidelines beginning in August of 2007. Our most recent price increase was announced for implementation June 1st. The intention of the changes was to address the increase in the riskiest component of our deliveries by introducing risk-based pricing and by tightening credit terms. We believe these actions will have a material impact on returns in this business. In fact, we have begun to see the improvement in the credit quality of our deliveries in the last couple of months. Some highlights of the changes include: we reduce the maximum LTV/TLTV to 97 percent on all standard and affordable products with FICOs below 700; we eliminated NINA, NIVA and no ratio loans in October and we introduced new risk based pricing fees in November, effective in March.

\* \* \*

Nonetheless, it remains true that the overall credit quality of our 2007 deliveries was worse than 2006 and the result of the GSE share, the overall market

increasing primarily through the delivery of riskier loans. We believe the trend peaked in November [2007]...

We have observed the improvement in our underlying loan quality by examining improvements in the worse quintile where a majority of the expected losses exist. Examples of these changes include, in January, loans with total LTVs greater than 90 percent declined 13 percent from the peak, FICOs less than 620 declined five percent and low and no dock loans declined 14 percent.

**P.**     **Freddie Mac Agrees to Support Enhanced Regulatory**
            **Supervision and to Raise Significant Amounts of Capital**
            **In Response to the 2008 OFHEO Report to Congress**

84     On April 15, 2008, OFHEO released its 2008 Report to Congress (the "2008 OFHEO Report") which flagged Freddie Mac's poor financial performance, deteriorating credit quality and internal control weaknesses and reiterated that the Company "remains a significant supervisory concern."

85.     With regard to the Financial Performance at Freddie Mac, the 2008 OFHEO Report states:

Financial results in 2007 were poor. Significant GAAP and fair value losses are linked to the rapid deterioration in credit performance, declines in long-term interest rates and derivative losses. The purchase of loans with weak underwriting, guarantee-fee pricing constraints, housing price declines and dislocation in the mortgage markets have impacted financial results, flexibility and overall strength of the Enterprise. Losses reduced capital levels, requiring the Enterprise to issue additional preferred stock, modify risk management and business practices, reduce dividends, control growth and actively manage balance sheet composition

*  *  *

A confluence of market and Enterprise-specific factors-deterioration in the housing and credit markets, substantial declines in interest rates in the second half of the year and replacement of lower-cost maturing debt-resulted in the Enterprise reporting a GAAP net loss of $3.1 billion. Freddie Mac has never before reported an annual net loss

46

Pretax income declined by $8 3 billion from year-end 2006, as a result of substantially higher credit-related expenses and valuation losses, higher losses on derivatives and lower net interest income, partially offset by higher guarantee fees and higher amortization income from the guarantee obligation.

* * *

The net loss in the third quarter and further declines in October and November depleted capital sufficiently for management to take action by selling assets, issuing preferred stock and reducing the common dividend.

* * *

Financial performance measured from a fair value perspective also suffered considerably. The fair value of net assets declined by $19 2 billion to $12 6 billion in 2007, despite $6 5 billion of new preferred stock issuances, as substantial increases in option-adjusted spreads reduced the value of mortgage assets and weakening in the housing and credit markets increased expectations of future default costs. The fair value of net assets attributable to common stockholders declined by $25 7 billion to $0 3 billion.

86.     The 2008 OFHEO Report details the decline in asset quality as well as the

inability of management information systems to timely monitor high risk assets.

Asset quality has deteriorated and overall credit risk has increased  Deterioration in credit quality reflects both market developments and management's strategic decision to purchase and guarantee certain single-family mortgages originated in 2006 and 2007 with higher risk characteristics  In addition, mortgage credit declines resulted in substantial deterioration in the fair value of the subprime and Alt-A and AAA securities portfolios  Counterparty credit risk has increased  Management information systems have not kept pace with the deterioration in credit quality.  Credit management responsibilities and accountabilities can be defined more clearly within the Enterprise risk management function and the business and governance structure.  Designation of an Enterprise-wide Chief Credit Office is recommended to ensure that an executive has direct authority and responsibility for the credit strategy and credit results of the Enterprise.

87     The 2008 OFHEO Report identified continued issues with internal control

weaknesses:

Internal controls are not fully effective. While tangible progress has been made during 2007 to remediate internal control weaknesses related to financial reporting, continued efforts are necessary.

88. The 2008 OFHEO Report identified numerous red flags pertaining to the selection of accounting standards and implementation of Generally Accepted Accounting Principals pertaining to the quality of capital at Freddie Mac. The 2008 OFHEO Report states:

> Management continues to develop and update its accounting policies. However, OFHEO's reviews concluded that further work will be required to develop complete accounting policies and procedures for Freddie Mac to meet the standards articulated in OFHEO's *Accounting Guidance*. During the past year, to assess Freddie Mac's design and implementation of its accounting policies, OFHEO performed several targeted reviews: securities that have become impaired in value (FAS115), the fair value option (FAS 159); and credit loss reserves (FAS 5), as discussed below.
>
> **Impaired Securities Accounting.** During 2006 and the beginning of 2007, OFHEO reviewed Freddie Mac's accounting policies and procedures for impairments in the values of its investment securities. OFHEO's findings, issued mid-2007, were that we believed Freddie Mac's policies were appropriate as written. However, OFHEO identified that Freddie Mac's actual evaluation of securities for impairment did not appear to be consistent with written policy, though consistent with GAAP. OFHEO will continue to monitor the Enterprise's implementation of its impairment accounting policies in the coming year to ensure safe and sound operations.
>
> **Fair Value Option Implementation.** Pursuant to FAS 159, The Fair Value Option for Financial Assets and Financial Liabilities, as of January 1, 2008, Freddie Mac reported a transition gain, under the fair value option election, of approximately $1 billion, which OFHEO notes provided an immediate boost to Freddie Mac's regulatory capital. Most of the transition gain is due to the election of securities for the change to fair value accounting, which carried an unrealized gain rather than losses in accumulated other comprehensive income . . . . During the coming year, OFHEO plans to further study Freddie Mac's application of the fair value option.
>
> **Reserves for Credit Losses.** OFHEO began a limited review of the Enterprise's approach to the calculation of its reserves for credit losses. Freddie Mac's applications for providing adequate reserves and related loss recognition in the income statement are generally

89    The 2008 OFHEO Report raised issues with the internal audit function at Freddie

Mac:

> While the 2007 audit plan appropriately devoted significant resources to
> supporting the Comprehensive Plan, internal audit did not adhere to a normal
> rotation cycle. As work on the Comprehensive Plan continues, internal audit is
> not expected to return to a normal rotation cycle in 2008. The inability to
> complete a full rotation cycle for several years and the fact that management's
> internal control self-identification process remains in the implementation phase
> increase the risk that control weaknesses may not be identified in a timely manner.

90.    The 2008 OFHEO Report flagged concern over declining asset quality and credit

risk at Freddie Mac:

> Credit risk is a supervisory concern. Asset quality has deteriorated and overall
> credit risk has increased  Increased credit risk is noted in the single-family
> guarantee portfolio, counterparties, nonagency asset-backed securities portfolio
> and multifamily business. The credit governance structure and some management
> information systems have not kept pace wiht the deterioration in credit quality
> Key issues are as follows:
>
> ●    Deterioration in Credit quality reflects market developments, pursuit of
>      housing mission goals and management's strategic decision to purchase
>      and guarantee certain single-family mortgages originated in 2006 and 2007
>      with higher-risk characteristics, including interest-only products, loans
>      with secondary financing, mortgages with FICO scores less than 660 and
>      loans with higher loan-to-value ratios  Evidence of increased risk layering
>      also appeared.
>
> ●    Substantial fair value declines in the value of nonagency private-label
>      securities (PLS) portfolio occurred during 2007  While the Enterprise
>      believes present subordination levels protect it from immediate loss of
>      principal and interest, the subprime mortgages underlying these securities
>      are experiencing high delinquency, foreclosures and severity rates.
>      Weakness in the financial strength of bond issuers providing additional
>      loss protection is also evident.
>
> ●    The rapid dislocation in the credit markets has also impacted the financial
>      strength of a number of major counterparties, including seller/services.
>      mortgage and bond insurers, and other financial counterparties.

- Increased credit risk has caused operational risk to increase with the volume of current and forecasted loan workouts, foreclosures and Real Estate Owned (REO) properties.

91.    With regard to Freddie Mac's transactions in Single-Family mortgages, the 2008

OFHEO Report states:

Throughout 2007 and at a level much higher than management's plan, the Enterprise continued to purchase and guarantee higher-risk mortgages. These purchases have performed more poorly than expected. The performance can be attributed to mortgages with high loan-to-value ratios, nonowner-occupied properties, low FICO scores, high debt-to-income ratios, limited or no documentation and underwriting through non-Freddie Mac lending systems. Evidence of risk layering is apparent, as a large number of loans share multiple risk attributes.

*    *    *

The credit guarantee business grew faster than planned-18 percent versus 11 percent-and exceeded overall mortgage debt originations as Freddie Mac was providing liquidity to the market. New higher-risk business coupled with declining house prices are reflected in deteriorating performance metrics-increasing serious delinquency rates, transition rates and loss severity rates-triggering increases to credit loss forecasts, provisions and reserves. Total credit related costs increased sharply during 2007. The allowance/reserve for losses rose form 4.0 basis points of the total credit Book of Business at the end of 2006 to 15.5 basis points at the end of 2007.

92    With regard to Freddie Mac's risk to capital and diminished capital position, the

2008 Report states:

[r]isk to capital has increased dramatically, primarily because of market and credit risks, which directly impacted capital through reduced current and future earnings.

On the basis of restated results in early 2008, Freddie Mac's surplus as a percentage of the OFHEO-directed requirement significantly declined from $2.1 billion, or 6.2 percent, for the fourth quarter 2006 to $0.9 billion, or 2.6 percent in the third quarter of 2007. The surplus continued to decline through October and November, with Freddie Mac failing to meet the OFHEO-directed requirement on November 30, 2007, prior to year-end 2007 accounting adjustments. Freddie Mac

took action to return to capital compliance by issuing $6 billion in preferred stock in early December 2007. Further erosion of capital in December resulted in a year-end 2007 surplus of $3.5 billion, or 10.0 percent. . .

While the decline in capital surplus was primarily the result of dramatically higher credit loss providing and continued market volatility, especially in the later part of the year, during the first part of the year negative earnings, continued dividend payments and growth in MBS contributed to declines in the surplus. Freddie Mac's expensive emergency corrective action in the fourth quarter emphasizes the need for permanently heightened attention to income forecasting, and more prudent capital management generally. . .

93. During the period relevant to this Complaint, Defendants, and each of them, violated their fiduciary duties to Freddie Mac. As a result of defendants' improper conduct, Freddie Mac has suffered severe damage to its business, financial condition and reputation, and will likely be subjected to heightened regulatory scrutiny which will, among other things, add to the Company's operating costs. Plaintiff demanded that the Freddie Mac Board take appropriate action to recoup that damage. The Directors have chosen to do nothing. Plaintiff, therefore, with this Complaint, seeks to recover Freddie Mac's losses.

## DERIVATIVE ALLEGATIONS

94. Plaintiff brings this complaint derivatively in the right and for the benefit of Freddie Mac to redress injuries suffered and to be suffered by Freddie Mac as a direct result of the violations of fiduciary and other common law duties by the defendants and the aiding and abetting thereof by the defendants. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

95. Plaintiff will adequately and fairly represent the interests of Freddie Mac and its shareholders in enforcing and prosecuting their rights.

96.    Plaintiff demanded in a letter that Freddie Mac's Board of Directors bring this or similar litigation in a letter, a copy of which is annexed hereto as Exhibit A. Since that time, Freddie Mac's Board has not taken any of the actions demanded in that letter. While a so-called Special Committee was formed, as indicated in Freddie Mac's public filings, the Special Committee has not taken any action to remedy the damages caused to Freddie Mac by the defendants' breaches of fiduciary duties and/or aiding and abetting thereof. Under these circumstances, the Board of Directors' inaction can only be viewed as a refusal of plaintiff's demand. The Board's refusal of plaintiff's demand is wrongful.

97.    Moreover, the Board's wrongful refusal of plaintiff's demand, along with the following, among other facts, demonstrate that the Board is not sufficiently disinterested or independent to control this or similar litigation. Indeed, plaintiff only made demand upon Freddie Mac's Board, despite its interest and lack of independence, because the Southern District of New York previously held that Freddie Mac could rely upon Virginia's so-called Universal Demand rule. Plaintiff believes that Virginia's Universal Demand rule does not apply to corporations not chartered in Virginia and that Freddie Mac, as a federally chartered corporation, cannot rely in any manner on that rule. Plaintiff believes that upon a full record, the Court would have ruled in accord with that position. Accordingly, plaintiff reserved his right to assert demand futility in the demand letter and the following facts, among others demonstrate that futility:

> (i)    The Board failed to remain adequately informed or to exercise proper oversight and good governance practices despite pursuit of a speculative business plan;

> (ii)    The Board has failed to commence any action against the principal wrongdoers despite the passage of time since the malfeasance came to

52

light   The Special Committee has taken no action whatsoever to remedy the damage caused to Freddie Mac;

(iii)    The members of the Board have numerous conflicts of interest, are not sufficiently independent and are, therefore, incapable of exercising independent objective judgment in deciding whether to bring this action;

(iv)    The acts complained of herein constitute violations of fiduciary and common law duties owed by the Board and these acts are incapable of ratification;

(v)    The acts complained of herein are illegal and unreasonable and thus are acts incapable of ratification;

(vi)    In order to bring this action for breach of fiduciary and common law duties, the members of the Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, with whom they are well acquainted and with whom they have entangling alliances, interests, and dependencies, which they would not do. They therefore would not be able to vigorously prosecute any such actions; and

(vii)    The members of the Board receive substantial benefits, and other emoluments by virtue of their membership on the Board and their control of Freddie Mac   The defendants are incapable of exercising independent objective judgment in deciding whether to bring this action

## COUNT I

### (Breach of Fiduciary Duties)

98.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

99.    Each of the defendants owed Freddie Mac and its securities holders the highest duties of loyalty, honesty, and care in conducting their affairs

100.    At a minimum, to discharge these duties, each of the defendants should have exercised reasonable and prudent supervision over the management, policies, practices, controls

and financial affairs of Freddie Mac  By virtue of these obligations, each of the defendants was required, <u>inter alia</u>:

      a.    to exercise reasonable control and supervision over the officers, employees, agents, business, and operations of Freddie Mac;

      b.    to be and remain informed as to how Freddie Mac was operating and, upon receiving notice or information of an imprudent, questionable, or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and

      c.    to conduct the affairs of Freddie Mac to provide the highest quality services and maximize the profitability of the Company for the benefit of its securities holders.

101    The defendants knowingly, intentionally, recklessly or negligently breached their fiduciary duties and, thereby, caused the Company to waste its assets, expend corporate funds, suffer from the effect of remedial measures imposed upon the Company by regulators, and impair its reputation and credibility for no legitimate business purpose, as a result of which Freddie Mac has been and continues to be substantially damaged.  Further, Freddie Mac has been, and is, exposed to substantial liability in connection with civil lawsuits caused by the defendants' wrongdoing.

102    Accordingly, plaintiff seeks on behalf of Freddie Mac monetary damages, injunctive remedies, and other forms of equitable relief.

### COUNT II

### (Indemnification)

103    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

54

104    As alleged herein, each of the defendants, acting as officers and/or directors of Freddie Mac and, therefore, as its agents, breached their fiduciary duties to Freddie Mac and its securities holders.

105.    Freddie Mac has suffered significant and substantial injury as a direct result of the defendants' knowing, intentional, or reckless breaches of their fiduciary duties as alleged herein. Accordingly, plaintiff seeks on behalf of Freddie Mac monetary damages from the defendants

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.    Declaring that the defendants have breached their fiduciary duties as alleged herein;

B.    Directing defendants, jointly and severally, to account for all losses and/or damages sustained by Freddie Mac by reason of the acts and omissions complained of herein;

C.    Requiring the defendants to remit to Freddie Mac all of their salaries and other compensation received for the periods when they breached their duties;

D.    Ordering that the defendants and those under their supervision and control refrain from further violations as are alleged herein and to implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence;

E.    Awarding pre-judgment and post-judgment interest as allowed by law;

F.    Awarding plaintiff's attorneys' fees, expert fees, consultant fees, and other costs and expenses; and

G.    Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial.

DATED: June 6, 2008                    Respectfully submitted,

**WEISS & LURIE**

By: _Joseph H. Weiss_
        Joseph H. Weiss (JW-4534)
        David C. Katz (DK-6235)
551 Fifth Avenue
New York, New York 10176
Telephone:     (212) 682-3025
Facsimile:      (212) 682-3010

**STULL STULL & BRODY**
Jules Brody (JB-9151)
Patrick Slyne (PS-1765)
6 East 45th Street
New York, New York 10017
Telephone:     (212) 687-7230
Facsimile:      (212) 490-2022

**Plaintiff's Counsel**

56

## VERIFICATION

I, Dr Carl Sadowsky, beneficiary of the Esther Sadowsky Testamentary Trust, declare under penalty of perjury as follows: I have read the annexed Verified Shareholder Derivative Complaint, know the contents thereof and the same are true and accurate to the best of my personal knowledge, information and belief, based upon the investigation of my counsel.

Executed on: May 19, 2008

_____
CARL SADOWSKY